No. 36.—MALCOLM A. MOSELY, plaintiff in error, *vs.* SILAS. GORDON, defendant.

[1.] When a witness swears that he has seen the instrument presented to. him, before, and was present when the same was executed : *Held*, that this. is equivalent to an affirmative statement, that by occular proof, the witness knew that the instrument had been executed in his presence ; and that if the contrary were true, and could be supported by evidence, the witness might be convicted of perjury.

[2.] Testimony, by itself vague, and apparently relating to matter not in issue, may be made certain in its character, and plainly relevant, by other facts in proof.

[3.] Where A, acting as the agent for M, in the sale of a negro slave, executes, with D A, a joint sale of said slave and another, belonging to the said D A, in exchange for a slave of G ; and the two make and deliver to. G their joint bill of sale, in which they warrant the soundness of both slaves, signing the instrument A and A ; and afterwards, action is brought by G against M, for a breach of said warranty, on account of the unsound- ness of the slave sold for M ; *Held*, that though A may have transcended: his authority, as agent, in uniting with D A in said sale, and in jointly,. with him, warranting the slaves conveyed ; yet, that inasmuch as he was. authorized, by M, to sell and warrant *his* slave, and there was no trans-. gression of his powers, as agent, in selling and warranting that slave, effect will be given to the deed against M, so far as that slave is concerned.

[4.] Testimony of a man's general character and reputation, in the treatment. of his slaves, is nothing more than hearsay testimony, and is inadmissible.

[5.] Where suit is brought upon an alleged breach of warranty, on a sale and purchase of a negro slave, and there is some testimony from which it might be inferred, that the slave was of no value at the time of sale; and also testimony, in another view, which might be taken by the Jury, sufficient to authorize the presumption, that the slave was not altogether valueless at the time, but no evidence was offered, going to fix any *amount* of such value, or furnishing any *data* by which the same could be ascertained : *Held*, that it was not error in the Court to charge the Jury, that "if the seeds of the disease were in the negro, at the time of the sale, though not developed until afterwards : but if the negro afterwards died of that disease, which was then upon him, this would be a breach of the warranty", inasmuch as the Court connected this instruction with the further charge, that " they must be satisfied, from the evidence, that the negro was of no value, at the time of the sale, or they must find for the defendant".

Assumpsit, in Troup Superior Court.     Tried before Judge WARNER, May Term, 1854.

Mosely *vs.* Gordon.

This action was brought by Gordon against Mosely, to re-cover the value of a negro sold by defendant to plaintiff, with warranty of soundness.

The following is the bill of exceptions:

Be it remembered, that the above cause was called in its or-der for trial, on a day in said term when both parties announced ready. The plaintiff opened his case, and offered and read in evidence to the Jury the following testimony, by commissions duly taken, to-wit: The deposition of one Isaac F. Gordon, offered to prove the execution of the bill of sale :

1st. He knows the plaintiff but not the defendant. 2d. He has seen the bill of sale before, (a bill of sale, a copy of which is hereinafter set forth, was attached to the interrogatories,) and was present when the same was executed by Allen & Ad-ams. He knows of the plaintiff's purchasing two negroes from said Allen & Adams—one, a boy, named Daniel, valued at Five Hundred and Fifty Dollars; the other, a boy named Tom, valued at Four Hundred and Fifty Dollars; and that a bill of sale, annexed, was given at the time of said purchase. The boy Daniel was, he supposes, some thirteen or fourteen years. of age, and the boy Tom about twelve years of age. Allen &. Adams did not disclose to plaintiff or any other person, at time of purchase, that they were acting as agents for Mosely, or that the defendant was the owner of said negroes. Cross-in-terrogatory : He answers, plaintiff is his father.

To the reading of these interrogatories defendant objected, because the witness did not prove the facts necessary to show the *legal conclusion*—the *execution* of the bill of sale; and be-cause he did not say he *saw* it executed. He might have been *present* at the time specified in the bill of sale, and yet not have seen or known anything about its execution ; and because, admitting the execution of the bill of sale, as testified to by this witness, yet, it did not make the defendant liable, nor prove the case made by the pleadings. The Court over-ruled the objections, and permitted the interrogatories to be read to. the Jury, and the defendant excepted.

The deposition of one John C. Simmes and Tollerson Kirby, by the same commission, taken thus : 1st. John C. Simmes knows the parties.  2d. That he heard defendant say that his agent, Mr. Adams, traded a negro boy to plaintiff, and that Mr. Allen acted with his agent, Mr. Adams, in said sale.  The defendant stated that the boy traded was his property.  The conversation, to the best of his belief, took place in March;. 1849.  Defendant said nothing more, in reference to said sale; than is already stated.  The defendant stated that he was the owner of the boy sold, and that Adams acted as his agent.

1st. Tollerson Kirby knows the parties.  2d. He answers that the defendant stated to him that Mr. Adams and Mr. Allen swapped two negroes to the plaintiff for one, and that one of those boys swapped belonged to him, the defendant, and the other to Mr. Allen.  This conversation, he believes, occurred some time in the year 1849.  He answers, that one of the boys swapped to the plaintiff, was stated, by the defendant, to have belonged to the defendant.  The defendant said nothing about any person's acting as his agent.  3d. Neither of them knew anything more.

The defendant objected to this testimony, as proving nothing ; and that if it proved anything, it proved a different contract from the one sued on and testified to by Gordon——this being a *swap*, which was different from a sale, &c.  The Court over-ruled these objections and permitted the interrogatories to be read ; and to this the defendant excepted.

Next, plaintiff introduced and read in evidence the depositions of Andrew B. Calhoun, by commission duly taken, to-wit :

1st. He answers, I am well acquainted with the plaintiff in this claim, and have a slight acquaintance with the defendant. 2d. He answers, I have been a practitioner of medicine for upwards of twenty years, but abandoned my profession at the commencement of the present year.  My location, since the year 1833, has been in Newnan, Coweta Co. Ga.  3d. He answers, I have, at different times, for many years, practised in the family of plaintiff, but do not now recollect to have attended,

at any time, on any of the negroes, except a boy named Daniel, to whom I first gave medicine on the 11th of May, in the year 1848. The boy was shown to me two or three weeks before I put him upon any regular course of treatment. General dropsy appeared to be the disease under which he labored, when I first saw him, accompanied with a painful affection of the joints, of a rheumatic character. After administering medicine to him for a short time, I succeeded in reducing the dropsical swelling. A good opportunity was then afforded of examining into the condition of his liver, and other important organs of the abdomen. The liver was then, for the first time, discovered by me to be materially enlarged, as also the mesenteric glands, spleen, &c. In this situation, I took Daniel to my own house, in Newnan, and kept him there, under treatment, until he died, which occurred some time in the early part of August, 1848. The general symptoms characterizing Daniel's case, when I first saw him, and subsequently, during the whole progress of his disease, induced me to believe that he had been diseased for a considerable length of time. How long he had been diseased, it is impossible for me to say; I think, however, he could not have been in the condition he was when I first saw him, without having been diseased long anterior to the December or January preceding. 4th. He answers: I have stated, in a previous interrogatory, the time at which I think the boy died; the amount charged by me for attendance on the boy, was twenty-four dollars and seventy-five cents. 5th. He answers: I know nothing more than I have stated already, that will go to show that Daniel was laboring under the disease of which he died previous to the December or January preceding his death. I do not think he could have been of any value to plaintiff, for months previous to the time I first saw him. I knew of no amount expended by plaintiff, in attempting to cure the boy, except what he paid to me.

1. He answers: I do not think the disease under which Daniel labored, very deceptive in its character, nor do I think that extensive visceral disease of the abdomen could be contracted

by great exposure, in any very short space of time, more espe-
cially when it is of that chronic character which Daniel's case
presented.    2d. He answers : The opinion advanced by me in
reference to the length of time Daniel had been diseased, is a
mere opinion, and may be incorrect.    I think, however, that
but few medical men could be found, who would so far disagree
with me as to controvert the opinion advanced by me.    3d. I
know nothing more that could benefit either of the parties, &c.

The plaintiff tendered in evidence a bill of sale, of which the
following is a copy : " Received of Silas Gordon One Thousand
Dollars, in full payment of the purchase of two boys, named
Daniel and Tom; the right and title of the said boys we war-
rant to be good ; and also warrant them sound, both in body
and mind, and slaves for life".

(Signed)                              ALLEN & ADAMS.
January 24, 1848.

To the reading of this bill of sale in evidence defendant ob-
jected, because the execution of it was not proven, and because
it did not, under the evidence, or on its face, bind the defen-
dant as sued in any manner, nor make him liable on its breach,
and was not admissible evidence under the allegations, &c.
The Court over-ruled the objections, and permitted the bill of
sale to go to the Jury ; and to this defendant excepted.

Plaintiff introduced Robert W. Simmes, who testified that in
in the early part of the year 1850, (after suit was brought) de-
fendant told witness that the boy Daniel belonged to him ; that
Allen & Adams had no right to make any such bill of sale, but
that it made no difference, as he could prove the boy was sound.

Plaintiff closed his case.    Defendant opened and introduced
Dr. Robt. A. T. Ridley, a practicing physician of long stand-
ing, who testified that he had heard the testimony of Dr. A. B.
Calhoun read, (and it was re-read to him) and that from the
symptoms of the boy Daniel's disease, as described by Dr. Cal-
houn, witness was of the opinion, as a medical man, that the
boy died of dropsy.    (The witness then gave a minute descrip-
tion of the different kinds of dropsy—its nature, origin, and

the causes which produced them.) He believed the case of Daniel was produced by exposure, neglect, &c—that kind of dropsy was generally produced in that way, and was most generally germinated in the last of the winter and first of the spring months, when winter and spring seemed to be contending for the mastery of the seasons, and the weather and temperature underwent frequent changes. Witness had met many cases of the kind, and sometimes they were produced in a short time, and he thought, from the symptoms of Daniel's case, it might have originated in a few weeks before the time Dr. Calhoun first saw him, or it might have been of long standing—it was impossible, as Dr. C. said, for any physician to say how long it had existed. Witness was the physician of defendant. Defendant was very careful with his negroes, and frequently sent for witness, professionally, when it was really not necessary. Had never been called to see Daniel. Perhaps had seen him— never knew him to be sick. Witness was of opinion that exposure to bad weather, over labor, late hours at night, with bad treatment and indifferent clothing, was well calculated to produce such a disease, as Daniel's especially in the winter and spring season of the year. The disease is almost incurable when neglected and allowed to take strong hold of its victim— but that it is frequently and easily cured if treated in proper time, and there are good preventive medicines. Witness was further of opinion that the chances of curing Daniel were much diminished by the failure to have him treated when Dr. Calhoun first saw him.

CROSS-EXAMINED: Said there were many diseases which a physician could not understand properly, without seeing them, and there were others which he could treat and understand as well in his office, and by prescription, as any other way—that dropsy was a disease which could be treated by prescription, and a correct opinion of its nature, cause and character could be formed by a description of its symptoms; especially when given by another physician. That Dr. Calhoun belonged to the first class of physicians in this country.

The defendant then read in evidence the depositions of John B. Duprey, by commission legally taken, as follows:

1st. He answers: I am not acquainted with either of the parties well, and know only Mr. M. A. Mosely, the defendant, whom I have often seen in Charlotte Co. Va., where he resides. I have never seen Mr. Gordon. 2. He answers: I did know a negro boy named Daniel. I raised him and sold him to Bacon & Mosely, of which firm M. A. Mosely, the defendant, was a partner. He was 9 years old in 1847, when I sold him, although he looked to be older. He was uncommonly likely and of dark brown complexion. I knew him from the time he was born till the first Monday in June or July 1847, when I sold to Bacon & Mosely at Charlotte C. H. Va., by whom, or by one of whom, (Mr. Mosely,) he was carried to Georgia in that fall, as I suppose. He was larger than boys usually are at 9 years of age, and was what I would call *number one.* 3. He answers: I knew the boy Daniel from the day of his birth to the day I sold him. I am a planter and stay at home pretty closely, and saw him nearly every day—these are the opportunities had of knowing his health—and I can state with certainty that he was as healthy a boy as I ever knew, and was perfectly sound. He had never been sick, to my knowledge, at all, except when he was a child, he may have had a cold like other children; but never was he so sick as to keep him from going about—and I pronounce him as healthy a boy as I ever knew. His family was very healthy, and he was perfectly sound when I sold him. 4. He answers: I have read the annexed release and accepted it before my deposition was commenced, and signed my name on the back of it towards accepting it—and of course before I testified. 3. He answers: That he has stated above the facts of the case, as known to him, and he can only say that the boy was sound as a dollar, and he sold him as above stated.

And then also, was read in evidence the depositions of Russel Lane, by commission legally taken, as follows, to wit: 1. He answers: I knew Malcomb A. Mosely. 2. He answers: The boy Daniel lived with me for three or four months last

preceding his departure for the South, and I was acquainted with him for that time. He never was sick while he lived with me. He looked well and was hearty during that time. He was of dark complexion—not as dark as I have seen—though dark. 3. He answers nothing. 4. He answers: I lived in the county of Halifax, State of Virginia, at the time the boy lived with me. I now reside in the adjoining county of Charlotte, Virginia. As to the age of the boy I know nothing—but his health was good. 5. I know nothing more.

The defendant then read in evidence the testimony of Paul V. Adams by commission legally taken, as follows: 1. He knows the parties. 2. I know the boy Daniel and supposed he was about eight or nine years old, and I travelled in company with him from the county of Charlotte in the State of Virginia, to Troup county in Georgia, in the fall of 1847; and I swapped said boy Daniel to Silas Gordon some time in the spring of 1848—said boy Daniel was carried to Georgia by Malcom A. Mosely and myself; I having been employed by said Mosely and Capt. William Bacon to aid Malcom Mosely in getting his negroes to Georgia. 3. I was with the boy about six months, and I believed him to be sound, and I never heard him complain during the time I was with him. 4. Nothing. 5. He was swapped to Silas Gordon and rated at five hundred dollars. 6. He answers: I believe he was sound and healthy, both in body and mind, as far as my knowledge of him extended—during a period of about six months, which time I was with him, I never knew him, Daniel, to be sick, and believe if there was a sound negro in the drove he was one.

*Cross-Answers.*—1st. He answered: I swapped said boy Daniel to Gordon, as the agent of Mosely & Bacon, and I did make a bill of sale, and warranted him sound; and I am not interested in making it appear that the said boy was sound, at the time of sale, having no interest, whatever, in the negroes—only acting as agent for Mosely & Bacon, as before stated. 2d. I have not, and know nothing of his being swollen before the sale. 3d. I know of nothing that will benefit plaintiff, other than that I gave a bill of sale in my own name. Trav-

elling in company Mr. David Allen, and he a trader also, we made a joint trade with Gordon, swapping him two negroes for one—said Allen owning one, and Mosely & Bacon the boy Daniel, for which negroes we gave a joint bill of sale—he, Allen, representing his own interest and I representing the interest of Mosely & Bacon. Further this deponent saith not. Defendant proved that he did not leave here in 1848, until some time in June.

The defendant introduced Robert W. Simms, John L. Stephens and Robert J. Morgan, by whom he proposed to prove the general character and reputation of Silas Gordon, the plaintiff, for his bad and cruel treatment of his slaves, generally; and furthermore, offered to prove by said witnesses, that said plaintiff had been indicted for cruel treatment to his slaves. All which testimony being objected to by plaintiff, was rejected by the Court; and to this decision the defendant excepts. Defendant closed; and after argument, the Court charged the Jury, among other things, "that (on the question of soundness) if they should believe that the *seeds* of the disease were in the negro, at the time of the sale, though not developed until some time after the sale, but afterwards died of this same disease that was upon him at the time of sale, would constitute a breach of the warranty of soundness". To this charge of the Court defendant excepts.

The Court further charged the Jury, "that in an action on a warranty of soundness of a slave, the measure of damages is the difference between the price paid and the actual value of the negro in his unsound condition, at the time of the sale, with interest to date; and if the negro was of no value at the time of the sale, then the measure of damages was the price paid, with interest". The defendant's Counsel insisted, in the argument before the Jury, that in this case the plaintiff was bound to prove, positively, that the negro was of no value, at the time of sale, or he could recover nothing; and that keeping the negro and failing to return him, or offer to return, was evidence of some value; and after the argument, defendant's Counsel requested the Court to charge the Jury: "That.

the burden of proof was on the plaintiff, and that unless the plaintiff had proven that the negro boy, at the time of sale, was of no value, they must find for the defendant". And the Court charged the Jury, "that *in this case* they must be satisfied, from the evidence, that the negro was of no value, at the time of sale, or they must find for the defendant;" and to this the defendant excepts.

The Jury returned a verdict for the plaintiff, and the defendant insists that the same is erroneous and should be set aside, and a new trial had: 1. Because the Court admitted the testimony of Isaac F. Gordon to be read to the Jury, to prove the execution of the bill of sale. 2. Because the Court erred in admitting the testimony of John C. Simmes and Tollerson Kirby to be read to the Jury. 3. Because the Court erred in permitting the bill of sale to be read to the Jury. 4. Because the Court erred in refusing to allow the evidence offered by defendant, of Simmes, Stephens and Morgan to go the Jury. 5. Because the Court erred in charging the Jury as it did charge, and in not charging as requested. 6. Because the verdict is contrary to law and to evidence, and without evidence. 7. Because the verdict is contrary to the charge of the Court; and 8. Because the verdict is contrary to the clear and decided weight of evidence.

HILL; E. Y. HILL & SON, for plaintiff in error.

STEPHENS, for defendant.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] Error is first assigned in this case, because the Court below admitted the testimony of Isaac F. Gordon, taken by commission.

It is contended that this evidence should not have been submitted to the Jury, because the witness did not state facts sufficient to show the execution of the bill of sale; that according to his statements, though he was present, it does not appear that he saw the instrument executed.

It is true, he does not say, in explicit terms, that he saw the parties affix their signatures, but he says what is tantamount thereto. He states, that he had seen the instrument presented to him before, and that he was present when the same was executed. This is plainly to be understood as an affirmative statement, that the instrument to which he is testifying, and which he identifies, he knows, by occular evidence, to have been executed in his presence. No other reasonable construction can be placed upon the statement, as we find it in the record; and there can be no doubt that if this were not true, and the same could be shown by proper evidence, the witness might be convicted of perjury.

[2.] It is next alleged, that the Court committed error in admitting the depositions of John C. Simmes and Tollerson Kirby.

It is correct, as stated, that the name of the slave, concerning whom these witnesses testify, is not given by them: nor is the time stated, of the purchase, to which reference is made, but only the time of the conversation. There are circumstances, however, in other portions of the testimony, which go to show what slave was spoken of, and also what purchase was the subject of conversation, and it was no doubt, with reference to these other features of evidence, that the Judge permitted this evidence to be considered by the Jury.

Testimony, by itself vague, and apparently relating to matter not in issue, may be made certain in its character, and plainly relevant, by other facts in proof. And that before us, falls within this description of evidence.

The witness, Kirby, speaks of Adams as having *swapped* the slave to plaintiff; and it is insisted, that this could not have been the same transaction with that spoken to by the other witnesses, as that was called a purchase. But a "*swap*" or "*exchange*" may, in general terms, be called a *sale*. And he who, by such a transaction, exchanges, barters or "*swaps*" one article for another, may very correctly be said to procure that article by purchase. The only technical difference, indeed, between a sale, and an exchange or barter, is, that "in

the latter, the price, instead of being paid in money, is paid in goods or merchandize, susceptible of valuation". (2 *Bouv. Dic.* 479.)   In this sense it was, without doubt, that this transaction was called a purchase.

[3.] It is also alleged that error was committed by the admission of the bill of sale in evidence—1. Because, as was contended, the same had not been proven to have been executed.   2. Because, as was insisted, it was not binding on the plaintiff in error, being an instrument executed by Allen & Adams, as co-partners, and not as agents for plaintiff in error.

The execution of the instrument is sufficiently proven, as we have already shown.

The other point raises a question of more importance.   It is very plain, from the record, that one of the slaves conveyed by this bill of sale, belonged to the plaintiff in error, and was sold by Adams, who, as his agent, had full authority to sell and warrant him.   The other seems to have been the property of Allen.   According to the statement of the witness, Adams, he and Allen made a joint trade with the defendant in error, "swapping him two negroes for one"; that Allen owned one of the negroes sold, and plaintiff in error, for whom he was acting as agent, the other, viz: the boy Daniel, the subject of this suit; and that they "gave a joint bill of sale" for the same.

The legality of this transaction is the matter now in question.   Was this bill of sale, as thus executed, binding and valid, as against the plaintiff in error ?

We have two observations to make in reply to this question.

1. It seems to have been the intention of the agent, by this form of conveyance, to give a good title, with warranty of soundness to the purchaser.   *Prima facie,* the transaction is a co-partnership transaction; but the evidence explains this, and shows that that which appears to have been a partnership transaction, was really not so; but was probably made to take this form for the sake of convenience.   It would seem very reasonable and just, after such proof, that effect should be given to the instrument accordingly; and that the substantial justice

of the transaction should not be defeated by the technical form of its execution.

2. If this be not correct, we are very sure, that according to this record, Adams, as agent, had authority from the plaintiff in error, at least, to sell and warrant the slave Daniel in the usual form; and that if, in selling him as he did, he transcended his authority by forming a partnership *pro hac* with Allen, in the sale of the two slaves, the act should be void only so far as he thus transcended his powers, and remain valid, as a sale and warranty of Daniel by him, as agent for the plaintiff in error. (*Paley on Agency*, 164. *Story on Agency*, §§85, 126.)

It was urged that the testimony proved an agency in Adams, for Bacon & Mosely, and not for Mosely alone: but on this subject, we find that the evidence is somewhat conflicting. It was proper for the Jury to determine this question; and the remarks which we have made, proceed upon the supposition, that Adams was found, by the Jury, to have been the agent for the plaintiff in error; a finding that, in our opinion, the evidence would have fully authorized.

[4.] It was next objected, that the Court erred in rejecting the testimony of Robert W. Simmes, John L. Stephens and Robert J. Morgan. By these gentlemen, it was proposed to prove "the general character and reputation of Silas Gordon, for his bad treatment of his slaves;" and also, that "he had been indicted for cruel treatment of his slaves".

It will be observed, that it was not proposed to show, by these witnesses, that from their knowledge of defendant in error and his slaves, he was in the habit of treating them cruelly, and in a way which was likely to produce such a disease as that of which the slave Daniel had died. It might be doubtful if even such evidence as this would be admissible; but that which was offered, was only evidence of *general character—reputation*; in other words, *hearsay*, and was plainly inadmissible.

[5.] The fifth and sixth assignments of error will be considered together. They grow out of the charge of the Court, who, among other things, instructed the Jury, "that on the question

·of soundness, if they should believe that the *seeds* of the disease were in the negro, at the time of sale, though not developed until sometime after the sale, but afterwards died of this same disease, which was upon him at the time of the sale, this would ·constitute a breach of the warranty of soundness".

The defendant's Counsel insisted, in the argument before the Jury, "that in this case, the plaintiff was bound to prove, positively, that the negro was of no value, at the time of sale, or he could recover nothing ; and that keeping the negro and failing to return him, or offering to return, was evidence of some value ; and after the argument, the defendant's Counsel requested the Court to charge the Jury, that the burthen of proof was on the plaintiff ; and that unless the plaintiff had proven that the negro boy, at the time of sale, was of no value, they must find for the defendant". And the Court charged the Jury, that "*in this case*, they must be satisfied, from the evidence, that the negro was of no value, at the time of sale, or they must find for the defendant".

To all of this the Counsel excepted.

Now the first part of this charge, by itself, would have been exceptionable. If the evidence had shown, that at the time of the purchase, although the seeds of the disease were in the slave ; yet, that by proper treatment, he might have been re-· stored to health, and was, accordingly, worth something—*any thing*—then the plaintiff in error was entitled to be allowed something for him in the Court below. And if the Court had added nothing to the sentence first quoted, perhaps the objection which is taken would have been fatal. It was proper for the Jury to decide, from the testimony of Dr. Ridley, or from any other evidence, whether or not the slave might not have been cured, if he had received judicious treatment from the time of the sale ; and if they believed that he might have so been cured, then was he, at that time, worth something. If worth something, and there was no proof of an offer to return the slave, and no evidence of *what* that something was ; that is to· say, no proof of *amount*, in such case there would have been nothing on which a verdict for the plaintiff could rest ; and the

defendant would have been entitled to the verdict. In such event, if the Judge had not added anything to the first sentence of instruction quoted, he would have failed to place the matter in its proper light before the Jury. But, as we have seen, the Court distinctly told the Jury, that in that case, they must be satisfied, from the evidence, that the negro was of *no value*, at the time of the sale, or they must find for the defendant. This surely brought their attention to the fact, that if there was before them any proof that the negro was of some value, under the circumstances in evidence, they must find for the defendant; and it sufficiently qualified what he had said, as to the seeds of the disease being in the slave at the time of the sale. This was recognizing, too, what the Counsel had insisted on in the argument, viz: that "the plaintiff was bound to prove that the negro was of no value, at the time of sale, or he could recover nothing".

Whether or not the keeping of the negro, and failing to tender him back, was evidence of *some* value, was for the Jury to decide. Certainly, under the instructions given, if they had found this to be so, they would have been compelled to find for the defendant. We cannot see, therefore, how that defendant has suffered injury from the charge; and we accordingly affirm the judgment.